## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| RICHARD K. LANPHER, | Civil No. 12-2561 (JRT/JSM) |
| Plaintiff, | |
| v. | |
| METROPOLITAN LIFE INSURANCE COMPANY and BANK OF AMERICA, *successor to Merrill Lynch & Co., Inc., as employer and plan administrator of The Merrill Lynch & Co., Inc., Supplemental Long Term Disability Plan*, | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| Defendants. | |

Katherine L. MacKinnon, **KATHERINE L. MACKINNON, ATTORNEY AT LAW**, 3744 Huntington Avenue, St. Louis Park, MN 55416, for plaintiff.

William D. Hittler, **NILAN JOHNSON LEWIS, PA**, 120 South Sixth Street, Suite 400, Minneapolis, MN  55402, for defendant Metropolitan Life Insurance Company.

Wood W. Lay, **WINSTON & STRAWN, LLP**, 100 North Tryon Street, Charlotte, NC  28202, and **BLAKE J. LINDEVIG**, Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, MN  55402, for defendant Bank of America.

This case involves a dispute over a former employee's access to benefits under a supplemental long-term disability insurance plan.  Plaintiff Richard Lanpher was an employee at Merrill Lynch (succeeded by Defendant Bank of America, referred to as "Merrill Lynch" throughout), through which he was automatically enrolled in Basic Long Term Disability Benefits plan (the "Basic" plan).  Once his salary exceeded $60,000, he

became eligible for enhanced benefits under the "Supplemental" long-term disability benefits plan.  He did not seek to enroll in the Supplemental plan right away, but did several years later.  To enroll in the Supplemental plan, he was required to fill out a Statement of Health and obtain prior approval, based on his submission, from the plan's insurer, Defendant Metropolitan Life Insurance Company ("MetLife").  Upon his application with Merrill Lynch, he received preliminary approval pending MetLife's approval based on his Statement of Health.  He then submitted the Statement of Health and subsequently received a letter from MetLife stating that he had been approved and that Merrill Lynch would make the appropriate changes to his coverage.

Six years later, he ended his employment with Merrill Lynch on account of depression and sought disability benefits under both the Basic and Supplemental plans. After several denials and appeals, he ultimately received notice from MetLife that he would receive benefits under the Basic plan.  That notice did not indicate that he had been either approved or denied for Supplemental benefits.  His attorney inquired further specifically about the Supplemental, and ten months later received from MetLife a denial notice for the Supplemental benefit, citing as grounds for denial the fact that he did not have coverage under the Supplemental plan at the time his employment ended.  On appeal to Merrill Lynch, his claim was also denied for lack of coverage.

Discovery has since revealed that, although MetLife has in its records that it approved Lanpher for the Supplemental benefits on the basis of his Statement of Health, there is no evidence that it communicated this to Merrill Lynch (which would have triggered the deduction of premiums from his paychecks).  The parties reference three

methods by which MetLife would have communicated this to Merrill Lynch at the time: (a) sending a monthly spreadsheet with the list of employees approved and for which insurance plan, (b) carbon copying Merrill Lynch on approval letters to participants after reviewing their Statement of Health, and (c) weekly status reports indicating approval of employees.   With regard to (a), the record includes the spreadsheet for the relevant period, which should have included Lanpher, but it does not.   With regard to (b), the approval letter Lanpher received from MetLife does not indicate that a copy was sent to Merrill Lynch.   With regard to (c), MetLife has not produced the weekly status reports, claiming that it has discarded them as part of its document handling policies.

Lanpher brings this suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, alleging first under 29 U.S.C. § 1132 that MetLife improperly denied him benefits due under the Supplemental plan and seeking reversal of that denial, and second, that MetLife and/or Merrill Lynch breached their fiduciary duties under 29 U.S.C. § 1104(a)(1) by failing to enroll him properly and subsequently denying benefits on that account.   All parties have moved for summary judgment, with Lanpher moving only against MetLife.

The Court concludes that it was an abuse of discretion and an unreasonable interpretation of the policy documents for MetLife to conclude that, although Lanpher had fulfilled all of the enrollment requirements, he was not entitled to benefits because of a determination that he was not "covered" at the time of his disability because premiums had not been paid, where the plan language did not expressly make coverage contingent upon the employee's payment of premiums.   The Court will therefore grant Lanpher's

motion for summary judgment on his claim for benefits under 29 U.S.C. § 1132(a)(1)(B). In the alternative, the Court concludes that Lanpher would alternatively be entitled to equitable relief on account of MetLife's breach of its fiduciary duty to Lanpher. Finding insufficient evidence of any breach of fiduciary duty by Merrill Lynch, the Court will grant Merrill Lynch's motion for summary judgment.

## BACKGROUND

### I.    THE PLAN

There are two long-term disability plans involved in this case. First, the Basic plan provides benefits of sixty percent of the first $5,000 of the employee's pre-disability monthly earnings to a disabled employee after six months of continuous disability. (Aff. of William D. Hittler, Ex. A ("ML") 22-23, Feb. 1, 2014, Docket No. 47.) The Basic plan required no contribution from employees. (ML 56.)

Employees who made more than $60,000 per year could elect to enroll in the second plan, the Supplemental long-term disability benefit plan ("the Supplemental Plan" or "the Plan"). (ML 121.) Employees who enrolled in the Supplemental Plan could elect to receive benefits of either forty percent or sixty percent of their predisability earnings over $60,000 after an elimination period of twenty-six weeks. (ML 115, 121, 159.)

The Plan allowed employees to enroll in the Supplemental Plan without providing evidence of insurability if they requested the insurance within forty-five days of becoming eligible. (ML 121.) But if an employee requested the Supplemental insurance more than 45 days after becoming eligible, the employee was required to give evidence

of their insurability to MetLife by submitting a "Statement of Health" form, which was subject to MetLife's approval.  (ML 121.)  The Plan's Certificate of Insurance provided that in such a circumstance, "[i]f We determine that You are insurable, such insurance will take effect on the date We state in Writing, if You are Actively at Work on that date."  (ML 121.)   The Certificate of Insurance describes the enrollment process as follows:

> If You are eligible for insurance, You may enroll for Disability Income Insurance: Long Term Benefits by completing the required form.  . . . If You enroll for Contributory Insurance, You must also give the Employer Written permission to deduct premiums from Your pay for such insurance. You will be notified by the Employer how much You will be required to contribute.

(ML 121.)  MetLife is the insurer and claims fiduciary for the Plan, and Merrill Lynch is the employer and plan administrator.  (ML 147-49.)

## II.    ENROLLMENT IN THE PLAN

Lanpher was automatically enrolled in the Basic plan as part of his benefit package with Merrill Lynch.  (Second Aff. of Katherine L. MacKinnon in Supp. of Mot. for Summ. J. ("Second MacKinnon Aff."), Ex. 2 ("Lanpher Statement") ¶ 4, Feb. 1, 2014, Docket No. 52.)[1]  He explained in a written statement made in the course of this dispute that in early 2001 he sought to enroll in the Supplemental Plan because he "needed the added income protection from the [Supplemental] plan because my income

---

[1] The Exhibits to the Second MacKinnon Affidavit are found at Docket Numbers 52, 53, and 54.  When citing to those exhibits, the Court will refer to the Second MacKinnon Affidavit without distinguishing at which docket entry that particular exhibit is found.

was far in excess of the $60,000 threshold at that time and I had a wife and three children to support." (Lanpher Statement ¶¶ 5, 7.)  After seeking to enroll with his employer, he received a letter dated April 4, 2001 from Merrill Lynch confirming his enrollment and indicating that he would need to fill out, and MetLife would need to approve, a "Statement of Health" form before coverage would take effect.   (Aff. of William D. Hittler in Supp. of Mot. for Summ. J. ("Hittler Aff."), Ex. B at BA 26, Feb. 1, 2014, Docket No. 47.)  The letter stated:

> You recently enrolled in the Supplemental Long-Term Disability (LTD) Plan for the 2001 plan year, and made the following election:

> | Coverage Option | Annual Benefit | Monthly Premium |
> |---|---|---|
> | 60% | $294,126.54 | $330.89 |

> For this coverage to take effect, the plan's insurer, MetLife, must review your statement of health and may also require you to undergo a physical examination.  Please complete the statement of health (if you have not done so already) and return it in the business reply envelope. . . .

> Your new coverage goes into effect once your application for coverage is approved by MetLife.  MetLife will notify you directly by letter of its decision.

(*Id.*)  When Lanpher received this letter on April 4, 2001, he had already submitted the Statement of Health form to MetLife on March 20, 2001, which MetLife received on March 22, 2001.  (Hittler Aff., Ex. A at 1737-38.)  Lanpher then received an approval letter dated from MetLife April 16, 2001 stating:

> Your request for the above listed benefit(s) was received and reviewed by our Medical Department.

> We are pleased to advise you that your request has been approved. . . .

> Your employer's benefits department will make the appropriate changes to
> your coverage.

(Hittler Aff., Ex. B at BA 27.)  Lanpher stated that "[f]rom these two letters, I was under

the impression that I had properly enrolled in the SLTD plan and had been approved for

the coverage.  I had no idea that there were any additional steps I needed to take to

[e]nsure that coverage was effective."  (Lanpher Statement ¶ 11.)

## III.   DISABILITY AND REQUEST FOR BENEFITS

On December 17, 2007, after a visit to the Mayo Clinic, Lanpher stopped working

on account of severe depression.  (ML 356-58; ML 310; ML 380-81, ¶¶ 13-14, 16-17, 23-

27.)  He applied to receive long-term disability benefits on June 13, 2008.  (ML 1314-

20.)  At some point in early 2008, he was contacted by a representative from Merrill

Lynch and told that he did not have SLTD coverage, with which he disagreed.  (Lanpher

Statement ¶¶ 14-15.)  On April 22, 2008, Lanpher submitted another application for

Supplemental benefits (a new Statement of Health).  (ML 1778-81.)  He explained that he

did this "as a precautionary measure to make sure that if I became disabled in the future

my family would still have income protection.  But I was not in any way conceding that I

had not been properly enrolled in the SLTD plan before."  (Lanpher Statement ¶ 18.)

On August 25, 2008, Lanpher received a letter from MetLife denying his claim for

benefits.  (ML 177.)  The letter stated that "MetLife has completed its review of your

claim for Long Term Disability (LTD) benefits" and that the claim was "denied effective

June 17, 2008."  (*Id.*)  The letter stated that the "medical evidence reviewed does not

demonstrate any functional impairment that would prevent you from working."  (ML

178.)  Lanpher appealed the decision on September 9, 2008 on the grounds that the evaluation had excluded reports from several physicians who had treated his depression, (ML 1295), but his claim was again denied: he received a second claim denial letter on October 6, 2008.  (ML 180.)  Lanpher submitted a review of the appeal, but upon review MetLife upheld its previous determination in a letter dated November 19, 2008. (ML 183.)

Lanpher, this time represented by counsel, again appealed this denial of benefits "under both the basic and the supplemental disability insurance policy with MetLife" on May 14, 2009.  (ML 187, 354.)  On June 23, 2009, MetLife sent a notice that his previous claims decision would be reversed.  (ML 322.)  On July 2, 2009, MetLife sent Lanpher a letter stating that "Your claim for LTD benefits has been approved effective June 18, 2008."  (ML 190.)  On November 10, 2009, Lanpher received a letter notifying him that his claim for "LTD benefits" was approved effective June 18, 2008 and specifically listing out the benefit payments he would receive.  (ML 170-71.)  The letter stated that because his disability fell into the "mental or nervous disorders or diseases" category, his benefits would be capped at 24 months, and would extend through June 17, 2010. (ML 170.)

## IV.    ONGOING ISSUES WITH SUPPLEMENTAL BENEFITS

After receiving the Basic benefits, Lanpher's counsel sought to figure out what had occurred with regard to his Supplemental benefits.  The record indicates that this inquiry set off months of communications between MetLife and Merrill Lynch in late

2009 and through 2010, seeking to determine the status of Lanpher's enrollment in the Supplemental plan.

## A.   Lanpher's Inquiries

On August 7, 2009, Lanpher's counsel sent a letter to MetLife to "clarify a few matters concerning" his long-term benefits award.  (ML 193.)  One of the issues raised in the letter was the "Award of Supplementary LTD Benefits" – Lanpher's counsel sought to understand why the benefit award included only benefits under the Basic rather than also the Supplemental Plan.  (ML 194.)  The letter stated:

> In his appeal, Mr. Lanpher explicitly requested an award of both the basic LTD benefit and the supplementary benefit.  Your letter of 7/2/09 does not address his entitlement in benefits under the supplementary policy.  Would you kindly provide him with payment under that policy as well?  Given that the definitions of disability are virtually identical under the basic and the supplementary policies, he should be entitled to benefits under both.

(ML 194.)  MetLife responded to the letter on August 21, 2009, stating:

> A review of the employment information received from Merrill Lynch . . . confirmed that Mr. Lanpher, as of December 17, 2007 (last day he worked prior to his disability), was eligible for the basic LTD benefit only.  I sent a request to Jarmaine Parker, Human Resources to confirm whether Mr. Lanpher was covered for the supplemental LTD benefit.  If we are notified that he in fact did have supplemental [sic] LTD coverage appropriate action will be taken.

(ML 195.)

On October 30, 2009, Lanpher's counsel sent a letter to MetLife about his claim for SLTD, observing that "we have received no explanation for not paying this claim," and "lay[ing] out our reasons for urging the insurer to either pay this claim or deny it in accordance with the claims regulations so that a proper administrative appeal can be

made."  (ML 175.)  The letter explained that in all three claim denial letters, "there was explicit reference made to denying claims under both policies," and no indication that there was a problem unique to SLTD.  (ML 175.)  The letter also explained that, after the Basic benefits were awarded, his counsel sent a letter to MetLife regarding the SLTD policy and received a response that was "not helpful" because it did "not indicate what MetLife's issue [wa]s with respect to Mr. Lanpher's Supplemental LTD claim."  (ML 176.)  The letter requested that if the insurer contended that he was not covered, "it must communicate this to Mr. Lanpher . . . and permit him to challenge the lack of coverage on an administrative appeal."  (ML 176.)  A document attached to the letter calculated the SLTD award to be $162,216.26, which is 60% of the portion of Lanpher's annual earnings of $330, 360.44 above $60,000.  (ML 196.)

Merrill Lynch sent a letter to counsel for Lanpher on December 11, 2009, denying his request for Supplemental LTD benefits.  (Decl. of Wood W. Lay in Supp. of Mot. for Summ. J. ("Lay Decl."), Ex. 14, Jan. 31, 2014, Docket No. 40.)  The letter stated:

> A review of the employment information received from Merrill Lynch . . . confirmed that Mr. Lanpher, as of December 17, 2007 . . . was eligible for the basic LTD benefit only.  I confirmed with Jermaine Parker, Human Resources, Merrill Lynch on August 21, 2009 that Mr. Lanpher did not have Supplemental LTD coverage.  I received this confirmation in writing from Mr. Parker.
>
> Since Mr. Lanpher did not have Supplemental LTD coverage effective on his last day worked . . . we have no alternative but to deny his request for Supplemental LTD benefits.

(*Id.*; ML 1753.)[2]  On December 29, 2009, Lanpher sent an email to Jermaine Parker at Merrill Lynch stating that he was entitled to the sixty percent benefits under the Supplemental plan and attaching the April 4, 2001 confirmation of enrollment from Merrill Lynch and the April 16, 2001 approval his Statement of Health from MetLife, along with a 2006 pay summary supporting the figures Lanpher requested.  (Lay Decl., Ex. 18 at 36.)  Parker responded, stating that he had "contacted MetLife requesting to have the SLTD payment processed."  (*Id.*, Ex. 18 at 37.)

### B.     Communications Between MetLife and Merrill Lynch

On January 5, 2010, Parker sent an email to a MetLife specialist with the "original approval letter for SLTD for Richard Lanpher."  (ML 1603.)  It stated that "[h]e was approved in April 2001 when we converted our systems in 2005 from peoplesoft to oracle it was never converted to oracle so it did not show.  Please process the SLTD payments for Richard the annual sltd amount is 162,216.44.  330,360.44 - 60,000.00 = 270,360.44 x 60% = 162, 216.26."  (ML 1603.)  A claim comment on January 6, 2010, reflected this email, stating:

> [R]eceived confirmation from HR (Jermaine Parker) that [employee] did have supplemental coverage effective April 16, 2001.  Had further [sic] questions whether [employee] was still actively covered for supplemental benefits at dlw (121707); did further investigation and found out that [employee] applied for supplemental coverage through statement of health unit in 2008 and was approved effective 4/22/2008 (which was after the dlw).  If [employee] was continuously approved for supplemental coverage

---

[2] A note from this period indicates that Lanpher received his Basic LTD benefits: ($35,264.70 on November 16, 2009, and $3,000 on November 20 and December 22.  (ML 1599.)

> from 4/16/01 – why did [employee] apply in 2008 – was there a drop in
> coverage at some point?

(ML 1603-04 (abbreviations in original).)

MetLife sent an email to Merrill Lynch on January 14, 2010, seeking several documents to "determine if Mr. Lanpher's supplemental coverage was active on his date last worked," including "history of his pay since April 2001 through December 2007 showing payment of premium for his supplemental coverage; and enrollment documentation for the years 2002 through December 2007 showing confirmation of supplemental coverage."  (ML 1604-05.)

Additionally, Lanpher sent an email to MetLife on January 30, 2010 stating, "Jermaine Parker requested MetLife to process my STLD on December 30, 2009.  Please advise when I will receive the SLTD payment" (and including email from Parker to Lanpher).  (ML 1617.)  MetLife sent an email response to Lanpher on January 30, 2010 stating:

> We were alerted that you have an approved "Evidence of Insurability"
> application in 2001 and another in 2008. . . . Evidence of insurability is an
> application of good health that an applicant makes when applying for
> coverage, implying that they did not have the coverage in place before.
> Because you have a disability date that commences on December 2007 and
> an application that was approved in 2008, this implies that you would not
> have had the coverage in place prior to that application.  In this regard,
> despite Jermaine [Parker]'s request to MetLife to process such a claim,
> MetLife must first validate that you have in fact properly elected, have been
> enrolled in, and covered for supplemental benefits[.] . . . Further, when
> Penny asked you why you had made application for Evidence of
> Insurability in 2008 it is my understanding that you did not answer the
> question.

(ML 1621-22; 1732.)   On February 9, 2010, Merrill Lynch responded to MetLife's January 25, 2010 email, stating that it had the "spreadsheets from MetLife to [Merrill Lynch] from 2001 forward," and that Lanpher was on the 2008 list showing approval as of May 19, 2008, but that that it did "not show on any spreadsheet from 2001 through 2007 that MetLife told ML of his approval of SLTD," and asking whether MetLife had proof that they informed Merrill Lynch.  (ML 1690.)

On February 11, 2010, Merrill Lynch sent an email to Lanpher stating:

> I have been working with MetLife on your issue,
>
> Metlife provided the copy of the approval letters that show you were approved Supplemental LTD coverage.  We are in agreement with the approval that occurred on 5/19/08 . . . .
>
> What we do not have (and what MetLife is requesting proof from Merrill Lynch of) is the approval from 2001.  Merrill Lynch has not [sic] record from MetLife that we were informed of this approval.  Therefore the system was not updated and you did not have deductions for Supplemental LTD taken from any of your pays.
>
> The reason why this is important is that MetLife is pushing back on Merrill Lynch to show proof that you paid for the Supplemental LTD Coverage.  I cannot show that proof.  Now [Merrill Lynch] has counter argued that it is MetLife's fault as they never followed proper procedures to inform Merrill Lynch of your approval.

(Lay Decl., Ex. 15.)  Lanpher responded that evening, requesting Merrill Lynch, as the "only named plan fiduciary" to "instruct MetLife to process my SLTD payment based on my 2006 compensation."  (*Id.*, Ex. 18 at 38.)

As of February 19, 2010, MetLife was still trying to figure out from Merrill Lynch whether Lanpher was covered for supplemental benefits on his last day worked and sent an email to a different department within Merrill Lynch seeking help in getting the information. (ML 1637.)   At this point, a MetLife Statement of Health Specialist

confirmed internally in an email to a Client Services Analyst that Lanpher had been approved for the benefits on April 16, 2001:

> I was able to locate the 2001 request in our archived files. He was approved for LTD on 4/16/01. Unfortunately, we cannot reproduce the weekly status reports since they're automated. However, we could have either communicated this Approval via paper report or email. System comments say that at the time, shjohnson@exchange.ml.com was receiving the weekly status reports.

(ML 1686.) The MetLife Client Services Analyst responded seeking clarification:

> Are they stating that Mr. Lanpher is confirmed as having the Supplemental coverage as early as 4/16/2001 and continuous with no break in coverage up to the last day of work? This is what we need to validate to process his claim.
>
> With a date last worked of 12/17/2007 he had many additional enrollment years to turn down and re-elect coverage which is what prompted the questions to begin with when the initial SOH application dated 2008 surfaced. We were always aware that he had been approved in 2001 but questioned why he was again approved in 2008. Did he drop off of coverage at any time. I do not see that this has been clearly addressed to date . . . .

(ML 1684.)

An entry in MetLife's communications log from March 4, 2011 states:

> It appears that there is a discrepancy between the associates records of when MetLife approved his Supp LTD coverage while an active employee of MER. Mr. Lanpher claims that his Supp LTD coverage was approved by MetLife 4/16/01 and he has provided a copy of a letter from MetLife's SOH Unit showing approval. MER record system does not have this approval and they show approval as of 5/19/08 (which he admits he did a second time when he found out MER did not have the 2001 approval). Please research if MetLife has any record of the approval from 2001 for the Supplemental LTD benefit?"

(ML 1665-66.) MetLife maintained in an interrogatory that between 2000 and 2007, MetLife "did not receive information about enrollment in the SLTD Plan at the individual

participant level" and that during that period Merrill Lynch provided information to MetLife on a yearly basis as to the total number of participants enrolled in the Plan. (Hittler Aff., Ex. C at 13.)[3]

On April 11, 2011, Karen McCrarey of Merrill Lynch's benefits department emailed another Merrill Lynch employee named Denise Cassidy stating:

> I just got off the phone with MetLife and they maintain their position that there is no evidence that he had Supplemental LTD coverage from 2001 through 2007 and therefore he is not entitled to a benefit under the plan. They have no record of[] approval of this benefit and in addition premium payments were not made during this time period . . . . I can confirm that MER also does not have record of this approval of coverage – only that he submitted an application to MetLife and that it was pending medical review by the carrier . . . . At this time, since this is a fully insured benefit and we do not have clear proof of administrative error I believe the answer needs to be that he is not entitled to a benefit under the plan.

(Second MacKinnon Aff., Ex. 26.)  On May 11, 2011, Cassidy emailed another Merrill Lynch employee named Janice DeFazio, asking for Lanpher's payroll information from 2001 to 2007 to determine if Lanpher had deductions taken during that time.  (Lay Decl., Ex. 19 at 2.)  DeFazio responded with a list:

> From 10/31/2003 through 12/31/05 paid $238.75/month
> From 1/31/2006 through 12/31/2007 paid $226.25/month
> From 1/4/2008 through 6/20/2008 paid $175.96 bi weekly

(*Id.*, Ex. 20 at 2.)  Cassidy responded seeking to confirm that the Supplemental LTD was deducted, as "in reviewing the info I do see the Contrib Life Ins Post Tax Vol Ded map to supplemental life, but does that also map to the Supp LTD?"  (*Id.*)  DeFazio responded:

---

[3] CMECF Pagination.

> OOHHHHH
> Now THAT'S a horse of a different color….
> Sorry MY BAD….I thought Supp Life
> He never had deductions for SUPP LTD…(ML deduction code 071)
> SORRY!!!!

(*Id.*)

### C.    Denial and Appeal

On June 29, 2010, a MetLife claims specialist informed Lanpher's counsel over the phone that it did not approve the supplemental benefits claim and that it would send a letter including the relevant ERISA rights.  (ML 1656.)   MetLife's notes state that "[w]e reviewed file with legal and determined we do not have information that shows clmt had enforce coverage prior for SLTD prior to his DDC.  We are denying any supplemental coverage."  (ML 1660; ML 1658.)   On June 30, 2010, MetLife sent Lanpher a letter denying the SLTD benefits claim:

> We have examined the entire claim file, including any additional material and information provided with your client's request for review.  For the reasons detailed below, we must uphold the denial of your client's claim for additional benefits. . . .  According to Merrill Lynch and MetLife's records, however, [your client] was not enrolled as of the date of his disability.  On December 11, 2009, we notified your client that he was eligible only for Basic LTD, and that MetLife had confirmed with Jermaine Parker of Merrill Lynch's Human Resource Department that Mr. Lanpher did not have Supplemental LTD coverage.
>
> You then appealed on behalf of your client.  We confirmed with Merrill Lynch's records that Mr. Lanpher did not pay for Supplemental LTD coverage.  If your client has proof of such coverage, including for example, pay stubs showing that there were deductions, or confirmation letters from MetLife or Merrill Lynch stating that he had Supplemental LTD coverage for the year that he became disabled, please submit them to us and we will

> reconsider. . . . Since the option for Supplemental LTD had to be selected annually, your client's submission of an LTD Statement of Health application from 2001 which was approved, and then another Statement of Health application in April 2008, does not show there was coverage for Supplemental LTD as of December 17, 2007, when he became disabled.

(ML 1675-76.)  Also on June 30, 2010, MetLife sent a letter informing Lanpher that his 24-month limit for the Basic LTD benefits was reached on June 17, 2010, and that he would not receive further payment as part of those benefits.  (ML 1671.)

Lanpher pursued the appeal process with Merrill Lynch, sending a request including factual background and legal analysis to the Bank of America [Merrill Lynch] Escalation Team on February 11, 2011.  (Hittler Aff., Ex. D.)  Merrill Lynch responded with a letter on June 1, 2011, stating:

> We are in receipt of a letter written on your behalf by Atty Katherine L. MacKinnon, dated February 11, 2011 regarding Supplemental Long Term Disability Insurance.  I apologize for the delay in responding to the correspondence. . . . After thoroughly researching your case, I regret to inform you that your claim that you were enrolled in Supplemental Long Term Disability insurance is denied.  We have found no evidence of enrollment or that you paid any premiums for the cost of this benefit.

(Hittler Aff., Ex. E.)  The letter stated that Lanpher may appeal the decision in writing within 60 days.  (*Id.*)  Counsel for Lanpher appealed in writing on June 15, 2011, asserting that the denial failed to comply with ERISA's requirements that claim denials include specific reasons and explanations and that Merrill Lynch "abdicated its fiduciary duty to provide him with a reasoned explanation for its denial."  (*Id.*, Ex. F.)  Merrill Lynch responded on October 7, 2011, again denying the appeal, explaining that "[w]ithout further documentation demonstrating his entitlement to a Plan benefit, we are limited to the Plan's records, which indicate that no Plan benefit is due."  (*Id.* Ex. G.)

## V.    EVIDENCE OF WHAT HAPPENED TO THE 2001 ENROLLMENT

The record also contains evidence regarding what MetLife and Merrill Lynch's standard operating procedures were for handling Supplemental enrollments that required approval of a Statement of Health.

MetLife stated in its responses to Lanpher's interrogatories that its process to keep Merrill Lynch informed of the status of an SLTD enrollee's application after it was submitted to MetLife for health status approval was through weekly status reports:

> [MetLife's] general practice as of April 2001 was to provide information regarding the status of its statement of health review (approved or denied) to Merrill Lynch via a weekly report or file feed with status.  Due to time elapsed and MetLife's document retention policy, reports from that time period are no longer available.

(Second MacKinnon Aff. Ex. 8, Interrogatory 8.)  MetLife produced a "report showing the result of its statement of health review for Merrill Lynch employees applying for SLTD coverage for 2001" but that "due to the passage of time and its document retention policy, it cannot confirm that these particular reports were provided to Merrill Lynch." (*Id.*, Request 2.)  The referenced report is a spreadsheet of MetLife's receipt and approval of Merrill Lynch employees' Statement of Health forms and includes an entry for "Richard Lanpher" listed as "approved" with an "SOH Status Date" of April 16, 2001. (*Id.* at ML 1764.)

Merrill Lynch has a slightly different account of how MetLife notified Merrill Lynch of Statement of Health approvals in 2001.  McCrarey, who worked with the

benefits department at Merrill Lynch from 2001 through 2010, described the procedure

between MetLife and Merrill Lynch for approving SLTD enrollment as follows:

> [w]hen MetLife approved the Statement of Health Form for a Merrill
> Lynch employee, it would notify Merrill Lynch by including the employee
> in an excel spreadsheet.  When Mr. Lanpher's claim for SLTD benefits
> came to my attention in February 2010, I located the spreadsheet covering
> March and April of 2001.  I searched the spreadsheet and Mr. Lanpher is
> not referenced in it.

(Decl. of Karen M. McCrarey ¶ 4, Jan. 31, 2014, Docket No. 41.)   The Court has

reviewed the referenced spreadsheet and confirmed that Lanpher is not listed there.

McCrarey explained that another process by which MetLife would inform Merrill Lynch

of approvals was to carbon copy Merrill Lynch on the Statement of Health approval

letters it sent to applicants, such as the April 16 letter Lanpher received.  McCrarey stated

that "[i]n or about February 2010, MetLife or Mr. Lanpher also forwarded me a copy of

MetLife's April 16, 2001 letter to him.  Normally, Merrill Lynch would be copied on that

letter, and I immediately noticed that, in this instance, no one from Merrill Lynch

appeared as a cc."  (*Id.* ¶ 5.)  She further states that she has reviewed the records and has

"not located any notification form MetLife to Merrill Lynch of Mr. Lanpher's approval

for SLTD coverage," and because Merrill Lynch was never notified of his approval, its

systems were not updated and he was "never enrolled in the SLTD plan and deductions

for premiums were never made from Mr. Lanpher's pay." (*Id.* ¶¶ 6, 7.)

## VI.   THIS ACTION

Lanpher brings this action against both MetLife and Merrill Lynch (now Bank of

America after a January 1, 2009 acquisition, (*see* Answer of Bank of America ¶ 13,

Jan. 28, 2013, Docket No. 8)), bringing a claim for denial of claim benefits under 29 U.S.C. § 1132(a)(1)(B) against MetLife (Count I) and a claim for breach of fiduciary duty under 29 U.S.C. § 1104 against both MetLife and Merrill Lynch (Count II).  In his complaint he seeks, on account of Count I, that the Court order Metlife to "pay him SLTD benefits due according to the policy pursuant to 29 U.S.C. § 1132(a)(1)(B)," and to pay him interest on the delayed benefits and costs and attorney's fees for this litigation. (Compl. ¶ 72, Oct. 5, 2012, Docket No. 1.)  On account of Count II, he asks that the Court order MetLife to "provide him with appropriate equitable relief to redress the possible loss of the SLTD policy coverage and interest pursuant to 29 U.S.C. § 1132(a)(3)." (*Id.* ¶ 85.)

Both MetLife and Merrill Lynch have moved for summary judgment on all claims, and Lanpher has moved for summary judgment against MetLife.  In support of his claims against MetLife, Lanpher presents an expert report by Richard Fitzpatrick (*see* Aff. of Richard Fitzpatrick, Feb. 1, 2014, Docket No. 51), which MetLife moves to exclude under Federal Rule of Evidence 702.  (*See* MetLife's Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 24, Feb. 22, 2014, Docket No. 56.)

Lanpher conceded at oral argument that he has no evidence of breach by Merrill Lynch, explaining that he included Merrill Lynch in this action because it was not clear at the outset of the case what the evidence would indicate as to fault between MetLife and Merrill Lynch but that "at this point, there is no evidence that we have developed or found or put forward" with regard to Merrill Lynch.  (Tr. 16:23-25, 17:13-15, May 9, 2014, Docket No. 76.)  The Court has independently reviewed the record and has found

no evidence upon which a reasonable jury could conclude that Merrill Lynch breached any fiduciary duty to Lanpher, and will thus grant Merrill Lynch's motion for summary judgment. The remainder of this Order will address Lanpher's remaining claims against only MetLife.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.   STATUTE OF LIMITATIONS

In its motion for summary judgment, MetLife argues that Lanpher's fiduciary duty claim is barred by the relevant statute of limitations in ERISA for such claims. Under 29 U.S.C. § 1113, claims for breach of fiduciary duty must be brought before the earlier of either:

(1) six years after

> (A) the date of the last action which constituted a part of the breach or violation, or

> (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113; *see also Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 858-59 (8th Cir. 1999) ("ERISA contains an express statute of limitations that bars breach of fiduciary duty claims after the earlier of six years from the breach or three years from the date that plaintiff acquires actual knowledge of the breach.").

MetLife argues that Lanpher's action here, which was filed on October 5, 2012, is barred by the three-year statute of limitations based on the fact that Lanpher was told by a Merrill Lynch representative at some point in early 2008 that he was not enrolled in the Supplemental plan, meaning that he had "actual knowledge" of any breach at that point and the limitations period expired in early 2011.

Lanpher argues that MetLife should be precluded from raising statute of limitations as a defense because it failed to include the defense in its responsive pleadings and was denied permission to amend its answer by the Magistrate Judge. Federal Rule of Civil Procedure 8(c) requires a party responding to a pleading to "affirmatively state any avoidance or affirmative defense," including statute of limitations. Fed. R. Civ. P. 8(c); *see also* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must

- 22 -

be asserted in the responsive pleading if one is required," but certain defenses, not including statute of limitations, may be raised by motion); *United States v. Big D Enters., Inc.*, 184 F.3d 924, 935 (8th Cir. 1999) ("A defense based upon the statute of limitations is generally waived if not raised in a responsive pleading."). If a party fails to plead the defense in its answer or responsive pleading, it waives the statute of limitations defense unless it is permitted to amend its responsive pleading. *See, e.g.*, *Roe v. Sears, Roebuck & Co.*, 132 F.2d 829, 832 (7th Cir. 1943) ("When defendant moved for summary judgment it had filed an answer [which did not include a statute of limitations defense], the legal effect of which was a waiver of its defense of the statute of limitations. It could not, therefore, unless relieved from its default, revive the defense it had waived. We need not consider when a defendant may be excused from its failure to plead the statute of limitations, and be permitted to amend its answer, because the instant case presents no such question. The defendant herein sought no such relief."). Certainly, "there is no waiver of the statute of limitations defense if the answer is properly amended to include it." *Groninger v. Davison*, 364 F.2d 638, 640 (8th Cir. 1966) (citing *Sears, Roebuck & Co.*, 132 F.2d at 832).

Here, MetLife sought to amend its answer to include a statute of limitations defense, which would have required modifying the scheduling order's deadline for amended pleadings. (*See* Am. Mot. to Modify Pretrial Scheduling Order and for Leave of Court to File Am. Answer, Mar. 10, 2014, Docket No. 66.) MetLife argued that it was not aware that Lanpher had heard from a Merrill Lynch employee in 2008 that he was not enrolled in the Supplemental plan, which would have triggered the three-year statute of

limitations under 29 U.S.C. § 1113(2), and that it did not discover this until after the deadline for amending pleadings.  (*Id.* at 3.)  It argued that these circumstances demonstrated good cause, which would warrant amending the scheduling order under Federal Rule of Civil Procedure 16(b)(4).  Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

In an order dated April 18, 2014, the Magistrate Judge denied MetLife's motion. (Order on Mot. to Modify Pretrial Scheduling Order, Apr. 18, 2014, Docket No. 73.)  The Magistrate Judge concluded that, although MetLife may not have learned of Lanpher's 2008 conversation until after the deadline for amended pleadings, Merrill Lynch had raised the defense in its answer and 26(f) report, both filed before the amended pleadings deadline, and that MetLife "was neither diligent in exploring the factual basis for the defense nor did it explain why it waited until now to bring its motion," such that MetLife did not demonstrate "good cause" as required under Rule 16(b)(4).  (Order on Mot. to Modify Pretrial Scheduling Order at 9.)

MetLife has not objected to this order of the Magistrate Judge and the time for any such objections has passed.  *See* Fed. R. Civ. P. 72(a) (fourteen-day deadline for filing objections to nondispositive orders by a Magistrate Judge); *see also* D. Minn. LR 72.2(a)(1) (same).  Thus, MetLife's pleadings do not state statute of limitations as a

defense and MetLife has not received permission to amend its pleadings to include it, so the defense is waived and the Court will not consider it further.[4]

## III.   DENIAL OF BENEFITS UNDER § 1132(a)(1)(B)

Lanpher argues that MetLife erred in denying his claim for benefits due to him under the Plan and seeks relief under § 1132(a)(1)(B).   Section 1132(a), entitled "[p]ersons empowered to bring a civil action," lists first that a civil action may be brought:

> (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

### A.   Standard for Reviewing MetLife's Decision

The parties initially dispute the standard by which the Court should review MetLife's denial of Supplemental benefits.   "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   MetLife argues that the relevant plan document affords it discretion to administer the plan and make eligibility decisions such that an abuse of discretion

---

[4] Nor did MetLife raise the defense in a motion to dismiss, which the Eighth Circuit has held is proper "when it 'appears from the face of the complaint itself that the limitation period has run.'" *Wycoff v. Menke*, 773 F.2d 983, 984-85 (8th Cir. 1985) (quoting *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 821 (8th Cir. 1983)).

standard of review applies, whereas Lanpher points to a different document to conclude that MetLife is not afforded such discretion and *de novo* review therefore applies. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 333 (8th Cir. 2014) ("[A] broad grant of discretionary authority entitles the Plan administrator to deference in exercising that discretion," such that district court should apply abuse of discretion standard of review (internal quotations omitted)).

Lanpher does not dispute that the policy certificate in effect in 2007 contains discretion-granting language, which it does.  (*See* ML 149 ("In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.").)   Instead, Lanpher argues that the 2007 document is not the relevant document and instead the 2001 policy certificate, which does not contain discretion-granting language, is the relevant document.   Lanpher presents no case law or other support for this argument, and given that "[i]t is well-established that ERISA does not prevent employers from adopting, modifying or terminating welfare plans at any time and for any reason," *Coffin v. Bowater Inc.*, 501 F.3d 80, 85 (1st Cir. 2007) (citing *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)), the Court declines to apply the 2001 language because the 2007 document was the policy certificate in effect when

Lanpher applied for benefits.[5]   The Plan appears to afford MetLife discretion such that the Court should review MetLife's denial decision for an abuse of that discretion rather than *de novo*.

However, this case presents an instance in which MetLife "had the responsibility of both determining eligibility for benefits and also paying those benefits," a "dual role [that] creates a conflict of interest." *Silva v. Metro. Life Ins. Co.*, --- F.3d ---, slip. op. at 9 (8th Cir. Aug. 7, 2014).   In such a case, the Eighth Circuit has recognized that such a conflict "trigger[s] a less deferential standard of review." *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002).   Although it is not clear what this less deferential standard of review should be, the Court will "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038-39 (8th Cir. 2010); *see also Silva*, slip. op. at 9-10 (considering conflict of administrator in reversing grant of summary judgment for administrator).[6]

---

[5]   The 2007 Policy Certificate also states: "Your consent or the consent of your beneficiary is not required to terminate, modify, amend, or change the Plan." (ML 147.)

[6]   In considering the conflict of interest in *Silva*, the court did not require evidence that the conflict influenced the administrator's decision, as MetLife suggests *Khoury v. Group Health Plan, Inc.*, 615 F.3d 946, 953-54 (8th Cir. 2010), requires.   The Court in *Khoury*, however, weighed evidence of conflict of interest only to determine the **amount** of weight to give to the conflict, not **whether** to consider it.   Thus, the Court, in light of *Silva*, considers the conflict in its review as one, not dispositive, factor.

### B.      MetLife's Denial of Lanpher's Claim for Benefits

MetLife denied Lanpher's claim for Supplemental benefits on the grounds that he was not enrolled on the date of his disability, explaining that "the option for Supplemental LTD had to be selected annually," and his proof of the approval of the Statement of Health form from 2001 "does not show there was coverage for the Supplemental LTD as of December 17, 2007." (ML 1675-76.)  It also observed that Merrill Lynch's records indicated that Lanpher did not pay for coverage. (*Id.*)

In determining the reasonableness of MetLife's interpretation of the Plan, the Court considers five "*Finley*" factors: "(1) whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation." *Manning*, 604 F.3d at 1041-42 (citing *Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992)).  The Court will apply these five factors, in addition to the "dispositive principle . . . that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own," *id.* at 1042, and "keep[ing] in mind MetLife's conflict and weigh[ing] that accordingly," *Silva*, slip. op. at 10.

The Court first observes that there is no dispute that Lanpher was not **factually** enrolled in the Plan – he was not on the lists or in Merrill Lynch's or MetLife's system as having been enrolled.  But this is not necessarily dispositive, as the Eighth Circuit

recently denied summary judgment for a plan administrator where it had denied coverage for an employee who had paid premiums but evidently never submitted a Statement of Health and therefore had never been approved as being insurable. *See Silva*, slip. op. at 11-12 (concluding that more information was necessary to determine what "evidence of insurability" meant under the Plan, where employee was denied coverage on the grounds that the employee had failed to provide such evidence where the Plan plainly required it). There, discovery revealed that there were over 200 employees who had been enrolled and for whom premiums had been deducted who had not submitted a required Statement of Health. *Id.* at 6. *Silva* teaches that an employer or administrator's own records of enrolled employees is not necessarily dispositive of whether an employee is "enrolled" or not. The ongoing uncertainty of Lanpher's enrollment status for both MetLife and Merrill Lynch employees from late 2009 through mid-2010 further illustrates this point.

Thus, the question is not limited to whether Lanpher was on MetLife's or Merrill Lynch's list of participants, but whether it was an abuse of discretion for MetLife to conclude that, based on the terms of the Plan, Lanpher was not entitled to coverage at the time of his disability. *See Silva*, slip op. at 11 (reversing grant of summary judgment and remanding for district court to determine whether administrator should have concluded that employee presented adequate evidence of insurability). MetLife's conclusion that Lanpher was not enrolled at the time of his disability was based in part on its observation that Lanpher was required to re-enroll in Supplemental benefits annually, but had not done so, such that even if he had been properly enrolled in 2001, that would not have secured his enrollment in 2007. But the language of the Plan plainly does not support

such grounds for denial: MetLife has pointed to, and the Court has found, no Plan language indicating that participants were required to re-apply or re-enroll annually. Rather, as Lanpher points out, information about the Plan from 2001 states that "[o]nce you are enrolled, your participation continues from year to year unless you make a change or become ineligible," indicating that if Lanpher had been properly enrolled, under the Plan's operation at that time he would not have been required to re-enroll annually. (Second MacKinnon Aff., Ex. 32 at BA 1371.) Thus, with regard to this explanation, the first *Finley* factor – whether the determination is contrary to the clear language of the plan – is dispositive. MetLife's determination that Lanpher was not entitled to benefits because he failed to reenroll annually was not reasonable in light of the Plan's language.

MetLife's denial letter also stated that it determined he was not covered because he did not pay for coverage. The Court concludes that this determination was also unreasonable in light of the Plan's language.[7] Lanpher argues that this was unreasonable because payment of premiums by him was "not a requirement of the policy" and it is "not

---

[7] It is not clear whether, in reviewing MetLife's denial of Lanpher's claim, the Court should review only the rationale supplied by MetLife or should instead (or additionally) review the rationale supplied by Merrill Lynch upon Lanpher's further appeal to Merrill Lynch after MetLife's denial of his claim, but Lanpher's denial of benefits claim is against only MetLife, not Merrill Lynch. However, given the similarity of these respective bases for denial, the Court need not sort out the extent to which it should explicitly review Merrill Lynch's denial and instead will review all possible interpretations of the Plan language that could support MetLife's denial. *See Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 660 (8th Cir. 1992) (concluding that "a court reviewing a denial of coverage" is not limited to considering "only those policy provisions specified by an insurer as the basis of denial of coverage when other policy provisions clearly may also be a basis for such a denial" and instead the court may consider "all of the policy provisions").

how the plan operated." (Mem. in Supp. of Pl.'s Mot. for Summ. J. at 27, Feb 1, 2014, Docket No. 50.)  MetLife counters that the Plan "undisputedly provides that a claimant whose application for [Supplemental Plan] coverage is approved must pay premiums for those benefits, and coverage terminates if and when such premiums are not paid." (Def. MetLife's Mem. in Support of Mot. for Summ. J. at 19, Feb. 1, 2014, Docket No. 46.) MetLife argues that the Supplemental Plan "requires that the Plaintiff pay the requisite premiums," and that "[i]t is undisputed that he did not do so at any time from April 2001 when he applied for coverage until December 17, 2007." (Mem. in Supp. of Def.'s Mot. for Summ. J. at 20, Feb. 1, 2014, Docket No. 46.)

Part of the challenge with the question of non-payment of premiums as a basis for the denial of Lanpher's claim is that there is no single provision addressing Lanpher's coverage or a requirement to pay premiums of which the parties dispute the meaning. Rather, the parties each point to various portions of both the policy certificate and the summary plan documents which they claim indicate that Lanpher either was or was not required to pay premiums in order to be enrolled in the Plan.  In support of the Plan requiring Lanpher to pay premiums, MetLife points to the Plan's language indicating that the Plan is one for "Contributory Insurance," meaning "insurance for which the Employer requires You to pay any part of the premium." (ML 117.)  The Plan also states "[y]ou must make a contribution to the cost of Disability Income Insurance: Long Term Benefits." (ML 147.)  However, the Plan also includes language suggesting that the participant is not required to pay premiums directly, but rather that they would be paid on the participant's behalf: it states that "[y]our insurance will end on the earliest of . . . the

end of the period for which the last premium has **been paid for You** . . . ," (ML 122 (emphasis added)),  and allows for the possibility of reinstatement of insurance in the event that "[y]our insurance ends because the required premium for Your insurance has ceased to be paid," (ML 122).  Further, in the section detailing the enrollment process, it states that "You must also give the Employer Written permission to deduct premiums from Your pay for such insurance.  You will be notified by the Employer how much You will be required to contribute."  (ML 121.)  These portions of the Plan suggest that it is not the employee who is required to make premium payments to MetLife, but rather the employer.

Although this language suggests that the employee must make contributions to the Plan in some way, nowhere does the Plan state directly that the **employee**'s payment of **premiums** is required in order for an employee to be covered by the Plan: the language suggesting that a "contribution to the cost" of the insurance does not mention premiums, and the language indicating that insurance will end after the last premium payment contemplates that premiums would be "paid for" the employee.  Thus, to the extent the Court must consider whether MetLife's denial of benefits is contrary to the "clear language" of the Plan under the first *Finley* factor, *see Manning*, 604 F.3d at 1041, the Court concludes that there **is no** clear language indicating whether the **employee**'s payment of premiums is required for coverage.  Not only is the Plan language not clear about whether the employee or the employer is responsible for making premium

payments,[8] but MetLife's interpretation of these provisions as making coverage contingent upon the employee's payment of premiums renders these provisions internally inconsistent.   Thus, the third *Finley* factor – whether an interpretation renders any language in the plan internally inconsistent, *see Manning*, 604 F.3d at 1041 – also weighs against MetLife's determination.[9]

Furthermore, nothing in the plan language indicates that the failure to pay premiums, where those premiums were to be automatically deducted, is a basis for non-coverage, where the employee has met the eligibility requirements.   Although not the Plan language, Merrill Lynch's internal Human Resources information stated that "You pay the full cost of any Supplemental LTD coverage you elect.   Your monthly premiums are automatically deducted from your pay on an after-tax basis."  (ML 159.)  It also stated that "[e]ach time you make an election (e.g., to enroll or to make a change), you authorize Merrill Lynch to initiate or make changes to your payroll deductions as if you had given the company a signed authorization to do so."  (ML 159.)

Thus, nowhere in the Plan language is payment of premiums made explicitly a requirement, or a prerequisite for receiving benefits under the Plan.   Furthermore, the

---

[8] Lanpher contends that the way the Plan actually functioned was that Merrill Lynch was required to pay premiums on a group basis to MetLife, rather than employees paying individual premiums directly.   The Court need not reach a conclusion on this factual matter because it concludes that this possibility, as contemplated by certain provisions of the Plan language, contributes to the lack of clear direction in the Plan language that coverage is contingent upon the employee's payment of premiums.

[9] The Court does not address the remaining *Finley* factors, as the parties make no arguments about them and they are not directly applicable given the circumstances here.

references to payment of premiums are inconsistent as to whether **the employee or the employer** is responsible for paying premiums.   Without clarity from the Plan as to whether the employer or the employee was responsible for paying premiums, the determination that Lanpher was not covered because he had failed to pay premiums was not reasonable under the language of the Plan.[10]

The cases MetLife cites in support of its position do not alter this conclusion.   In *Jordan v. Tyson Foods, Inc.*, 257 F. App'x 972 (6th Cir. 2007), the plaintiff had been properly enrolled in a short term disability plan, for which the required payments were automatically deducted from his paychecks, and was permitted to continue that coverage through leaves of absence under the Family and Medical Leave Act ("FMLA") so long as he continued to make the required premium payments.   *Id.* at 973-74.   He took unpaid FMLA leave, but because he was not receiving paychecks no premium deductions were made and the notice which would have informed him that he needed to affirmatively make such payments was sent to the wrong address.   *Id.* at 974.   When his employer discovered that premiums had not been paid, he was "disenrolled" from the plan.   *Id.* The plaintiff argued that this disenrollment was improper because he did not actually

---

[10] An example further illustrates this point.   One of the possibilities left open by the unclear Plan language is that the employer collects premiums from the employee and passes them along to the insurer.   Assuming that this is the arrangement (which is a reasonable interpretation of the Plan's language, although it is not clear that it is the insurer's intended interpretation) in such a situation it would certainly not be reasonable for an employee to be denied benefits if the employer deducted contributions for premiums from the employee's paycheck but failed to pass them along to the insurer.   Although here it is not disputed that contributions for premiums were not deducted from Lanpher's paycheck, this illustrates how the Plan's language, with its lack of clarity as to **who** is responsible for paying premiums, does not support basing the claim denial here on Lanpher's non-payment of premiums.

receive the notice that he was required to continue making premium payments during unpaid leave. *Id.* at 978. Observing that the relevant plans "stated that coverage will be discontinued for employees who fail to pay their premiums," *id.* at 979; *see also id.* ("An employee's duty to pay premiums was noted in the IBP Plan Summary Plan Description"), the court concluded that the plaintiff's nonpayment of premiums could not be attributed to the employer for mailing the notice to the wrong address, instead concluding that the plaintiff had constructive notice of his duty to pay premiums. *Id.* Thus, the court concluded that the employer's denial of benefits was not arbitrary or capricious. *Id.* at 980.

MetLife also cites to *Anderson v. Intermountain Power Serv. Corp.*, 198 F.3d 257 (10th Cir. 1999) (unpublished table opinion), in which the plaintiff stopped working because of a disability but was permitted to continue his employer-provided medical insurance so long as he paid the premiums. *Id.* at *1 (observing that the employer notified him "that he was required to pay regular premiums if he wanted to keep his health insurance in effect and that his insurance would be canceled if payments were not made" and notified him again several times after he "failed to make timely premium payments"). After the plaintiff repeatedly failed to make premium payments, the employer canceled his medical coverage, citing his nonpayment of premiums. *Id.* The employer later amended its medical insurance plan language to include language under the heading "Collection of Plan Participant Contributions," which required that "[t]he disabled employee shall submit the appropriate monthly contribution on a monthly basis to the Company" and permitted a thirty-day grace period. *Id.* The plaintiff failed to

make a payment within the grace period, and the employer cancelled his benefits. *Id.* at *2. The court rejected all of plaintiff's arguments that the employer's cancellation of his insurance was improper and affirmed summary judgment for the employer. *Id.* at *2-5.

Neither *Jordan* nor *Anderson* supports MetLife's argument here, because the plan language regarding employee obligations to make premium payments was, in both cases, much clearer than the Plan language here. In *Jordan*, the Summary Plan Description "stated that coverage will be discontinued for employees who fail to pay their premiums," and noted the employee's duty to pay premiums. *Jordan*, 257 F. App'x at 979. In *Anderson*, the court quoted the plan language as expressly requiring that "[t]he disabled employee shall submit the appropriate monthly contribution on a monthly basis to the Company." *Anderson*, 198 F.3d 257, at *1. Here, in contrast, the plan language includes no express requirement that employees pay premiums, and instead includes conflicting language about whether the employee or the employer was required to pay the premiums.

Finally, MetLife also cites to *Byrd v. Canadian Imperial Bank of Commerce*, 354 F. Supp. 2d 597, 602 (D.S.C. 2005), *aff'd*, 157 F. App'x 643 (4th Cir. 2005). There, plaintiff-securities broker left his employment on account of a vision disability and, although he properly received disability benefits from his employer, claimed that his employer failed to properly enroll him in a supplemental long-term disability insurance program with a third-party insurer. *Id.* at 602. Under this insurance, the employer did not pay any of the premiums, but "supposedly made payroll deductions from the wages of individuals who purchased this supplemental insurance" which it would then forward

to the insurer. *Id.* Employees were required to fill out and submit an application for this insurance. *Id.* In granting summary judgment for the employer on this issue, the court observed that the plaintiff "admit[ted] that he cannot find documentation to prove that he filled out the application for supplemental benefits or that he paid for this insurance," that the employer had presented evidence that the insurer "ha[d] no records indicating that Plaintiff applied for, or is entitled to, supplemental coverage" and "no information indicating [it has] ever maintained a policy on this individual[.]" *Id.* at 605 (internal quotations omitted) (alterations in original). The court also observed that the plaintiff's "payroll records plainly demonstrate that he did not pay for supplemental benefits." *Id.* Plaintiff's only evidence that he had enrolled included "his conclusory allegations that he knows he enrolled in supplemental insurance, and his assistant's testimony that it was Plaintiff's pattern and practice to elect the maximum amount of benefits," which the court concluded could "[]not defeat Defendants' well-supported argument, including documentation, that Plaintiff did not elect or pay for supplemental coverage." *Id.*

This case, too, is distinct from the circumstances here. The evidence in *Byrd* indicated that the plaintiff had never even applied for the optional supplemental disability insurance, which was the basis of the court's conclusion that it was not the employer that failed to enroll him. *Id.* In contrast, the parties here do not dispute that Lanpher properly enrolled, submitted the Statement of Health form, and even received confirmation from both MetLife and Merrill Lynch that his application and enrollment had been received and accepted. MetLife has not presented a case in which a court found a claim denial to be supported by substantial evidence on the basis that the employee failed to pay

premiums where the employee received confirmation of enrollment and approval in an insurance plan and where the plan language did not clearly make coverage contingent upon the employee's payment of premiums.   The Court therefore concludes that MetLife's denial of benefits on the ground that Lanpher was not covered because he failed to make required premium payments was not supported by the language of the Plan or substantial evidence.   The Court will therefore grant Lanpher's motion for summary judgment against MetLife on his claim for benefits under 29 U.S.C. § 1132(a)(1)(2).

## IV.   FIDUCIARY DUTY AGAINST METLIFE

In the alternative, the Court concludes that Lanpher would be entitled to summary judgment on his other claim against MetLife – that it breached its fiduciary duty under ERISA by failing to take necessary action to enroll him in the Supplemental Plan upon approving his Statement of Health.   ERISA imposes a duty on fiduciaries to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   29 U.S.C. § 1104(a)(1)(B).  Lanpher claims that MetLife breached this duty and that he is therefore entitled to "other appropriate equitable relief" under 29 U.S.C. § 1132(a)(3), in the form of an order requiring, among other things, MetLife to reinstate him into the Supplemental Plan such that he is entitled to benefits minus the cost of premiums that should have been

deducted from his paychecks.  (*See* Mem. in Supp. of Pl.'s Mot. for Summ. J. at 46, Feb. 1, 2014, Docket No. 50.)

MetLife makes several arguments against this claim.  First, it argues that the relief Lanpher seeks is not available because it is not truly equitable relief and Lanpher is precluded from bringing a fiduciary duty claim for violation of § 1104 seeking "other appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) because Lanpher had the ability to bring a cause of action under § 1132(a)(1)(B) (if not the ability to succeed on such a claim).  Second, it argues that its role in transmitting notice of approvals of Statements of Health is not done in its fiduciary capacity, but rather in a ministerial capacity.  Finally, MetLife argues that Lanpher's fiduciary duty claim is barred by the statute of limitations.  Besides seeking to exclude Lanpher's expert, who opines that MetLife breached its fiduciary duty to Lanpher, MetLife does not appear to contest that it breached any fiduciary duty it may have had in handling its approval of Lanpher's Statement of Health, and the Court concludes that, even without considering the expert's opinion, Lanpher has demonstrated that MetLife breached this fiduciary duty.

### A.    Availability of Equitable Relief

29 U.S.C. § 1132(a)(3) permits a plan participant or beneficiary to bring an action "to obtain other appropriate equitable relief . . . to redress . . . violations [of this subchapter or the terms of the plan] or to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  There are two potential hurdles to awarding Lanpher equitable relief for breach of fiduciary duty.  First, the Supreme Court has made

clear that "other appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) is limited to those forms of relief that would have been within the power of courts of equity, rather than legal relief such as compensatory or monetary damages. Second, MetLife argues that the Eighth Circuit has made clear that fiduciary duty breach actions are not available to plaintiffs who have other avenues for causes of action under ERISA. The Court concludes that neither would preclude it from awarding Lanpher at least part of the relief he seeks here (if relief under 29 U.S.C. § 1132 were not available) – an order requiring MetLife to treat Lanpher as having been enrolled and covered by the Supplemental Plan at the time of his disability and to accept, after the fact, his payment of premiums for that coverage.

### 1.     Limitation on Monetary Relief as Equitable Relief

The term "other appropriate equitable relief" in 29 U.S.C. § 1132(a)(3) "is limited to relief that was 'typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages).'" *Pichoff v. QHG of Springdale, Inc.*, 556 F.3d 728, 731 (8th Cir. 2009); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256-57 (1993). "Other appropriate equitable relief" does not include compensatory or money damages that are due under a contract or insurance plan. *Knieriem v. Grp. Health Plan, Inc.*, 434 F.3d 1058, 1061 (8th Cir. 2006) ("The Supreme Court and this circuit precedent precludes an award of compensatory damages under section 1132(a)(3)(B)." (citing *Mertens*, 508 U.S. at 258-59)). The Eighth Circuit has repeatedly applied this rule to preclude plaintiffs from seeking monetary awards for losses suffered on account of fiduciary

decisionmaking.  *See, e.g.*, *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir. 1999) ("[M]onetary damages for the difference between what [plaintiff] says he could have earned and what he in fact earned" under investment plan were not equitable restitution and therefore not available under § 1132(a)(3)); *Slice v. Sons of Norway*, 34 F.3d 630, 632 (8th Cir. 1994) (money damages not available where plaintiff sought to recover difference between the amount of monthly pension payments he first began receiving and lower, deducted amount after company discovered computational error).

Although compensatory damages are not available via § 1132(a)(3), courts have acknowledged that in some circumstances, classic equitable remedies will have the effect of conferring a monetary benefit on a party.  *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1880 (2011) (where "the District Court injunctions require[d] the plan administrator to pay to already retired beneficiaries money owed them under the plan as reformed[,] . . . the fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief").

In *Varity Corporation v. Howe*, 516 U.S. 489 (1996), the Supreme Court affirmed an award of individual equitable relief for former participants in a plan on account of their employers' breach of fiduciary duty in inducing the employees to switch from one plan to another.  516 U.S. at 515.  The equitable relief ordered by the district court, which was ultimately affirmed by the Supreme Court, was "an order that, in essence, would reinstate each of them as a participant in the employer's ERISA plan."  *Id.* at 492, 495. The Eighth Circuit has characterized the relief in that case as injunctive relief, *see Wald v. Sw. Bell Corp. Customcare Med. Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996) ("The Court

[in *Varity Corporation v. Howe*] held that the employees were entitled to injunctive relief reinstating them to the former employer's plan under section 502(a)(3)"), which is relief that is permissible under 29 U.S.C. § 1132(a)(3), *see Amara*, 131 S. Ct. at 1879 ("affirmative and negative injunctions obviously fall within [the] category" of relief permitted under 29 U.S.C. § 1132(a)(3)).

The Court concludes that at least part of the relief Lanpher seeks here as part of his fiduciary claim is also, in essence, injunctive relief ordering, similar to that in *Varity Corporation*, that he be reinstated as a covered participant in the Supplemental Plan and correspondingly permitted to pay the premiums that were not deducted from his paycheck from April 2001 through December 2007 on account of MetLife's failure to notify Merrill Lynch that it had approved his insurability.  Although this remedy would likely have the effect of resulting in monetary payments to Lanpher from MetLife for any benefit payments to which he becomes entitled as a covered participant (and in his count for relief under 29 U.S.C. § 1132(a)(1)(B) he asks for those payments as direct compensatory relief), the remedy the Court concludes is appropriate is truly injunctive in character, as it is "fitted to the nature of the primary right" ERISA's fiduciary duties were intended to protect.  *See Amara*, 131 S. Ct. at 1879 ("[O]ther relief ordered by the District Court resembles forms of traditional equitable relief.  That is because equity chancellors developed a host of other distinctively equitable remedies – remedies that were fitted to the nature of the primary right they were intended to protect." (internal quotations omitted)).  In his memorandum in support of his motion for summary judgment, Lanpher rephrases the relief he seeks as "(1) grant him summary judgment against MetLife;

(2) order MetLife to reinstate him into the SLTD plan; (3) order MetLife to pay him two years of SLTD benefits, less premiums . . . ."  (Mem. in Supp. of Pl.'s Mot. for Summ. J. at 46.)  He stated in his Reply that he "has at all times acknowledged premium payments should be deducted from his SLTD benefits due," such that "MetLife will receive the premiums it would have received all along."  (Reply Mem. at 3, Mar. 7, 2014, Docket No. 65.)  Although he phrases it as the Court ordering various amounts to be exchanged, what Lanpher essentially seeks is to put both he and MetLife in the position in which they would be had MetLife properly notified Merrill Lynch of its approval of Lanpher for participation in April 2001.

This is similar to the relief awarded in *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1185-86 (9th Cir. 2004), where the Ninth Circuit addressed an appeal from a district court's order of "other appropriate equitable relief" which stated that "Chevron, as the plan administrator and sponsor, is hereby ORDERED to take all steps within its authority to modify the plan records to show that the foregoing six plaintiffs were involuntarily discharged as of the date of their separations, and to ensure that said six plaintiffs are provided the SITE benefit in accordance with said change."  *Id.* at 1185-86 (internal citations omitted).  Observing that this relief was similar to the reinstatement affirmed in *Varity Corporation*, the court observed that, "[o]n its face, an order to modify plan records is not an award of monetary damages."  *Id.* (also observing that "[i]f 'reinstating' employees into a plan [as the Supreme Court affirmed in *Varity Corporation*] constitutes 'appropriate equitable relief,' there is no reason to conclude that 'instating' them would not").  The court further reasoned that:

More importantly, the relief granted by the district court here is also equitable in substance. **To instate the plaintiffs retroactively into [the SITE benefits program] simply puts them in the position they would have been had Chevron not breached its fiduciary duty**: as employees who "self-tapped" and indicated a willingness to be involuntarily terminated to receive the SITE benefit. Although in this instance the district court's remedy will result in Chevron paying plaintiffs "sums of money" equivalent to the SITE benefits they lost because of Chevron's breach, the mere payment of money does not necessarily render the award compensatory "monetary damages."

*Id.* at 1186 (emphasis added). Similarly here, putting MetLife and Lanpher in the position they would have been if MetLife had properly carried out its approval of Lanpher's coverage by ordering MetLife to treat him as being reinstated and Lanpher to pay the premiums that were not deducted, is "equitable in substance." *Id.*; *see also Atwood v. Swire Coca-Cola, USA*, 482 F. Supp. 2d 1305, 1316 (D. Utah 2007) ("putting the Plaintiff in the position that he would have been in had the Defendant properly enrolled the Plaintiff in its Plan when he was first hired" was equitable relief and relying on *Varity Corporation* and *Mathews*).[11]

---

[11] This case is not like *Pichoff v. QHG of Springdale, Inc.*, 556 F.3d 728 (8th Cir. 2009), a case not cited by any of the parties, where the Eighth Circuit held that compensation for benefits that were supposed to have been paid but were not because employer failed to inform insurer that employee's participation in plan should continue after employee took disability leave was not equitable relief. *Id.* at 732. There, the plaintiff (on behalf of her husband, the former employee's, estate) sought merely the benefits, relief which did not require any injunctive or unique equitable relief as is required here, given that Lanpher also seeks to be given the opportunity to pay the premiums that were never deducted.

Rather, this conclusion is consistent with the Eighth Circuit's recent opinion in *Silva*, in which the Eighth Circuit observed that the Supreme Court's decision in "*Amara* changed the legal landscape by clearly spelling out the possibility of an equitable remedy under ERISA for breaches of fiduciary obligations by plan administrators," and ruled that the plaintiff could amend his complaint to add "make-whole, monetary relief under § 1132(a)(3)," as the relief sought for his fiduciary duty claim. *Silva*, slip op. at 17, 22-23. *Silva* suggests that Lanpher

(Footnote continued on next page.)

### 2.   In Conjunction With Claim Under § 1132(a)(1)(B)

MetLife points to another limitation on the availability of equitable relief to Lanpher: the Supreme Court's statement in *Varity Corporation* that the "catchall" provision for "other appropriate equitable relief" in 29 U.S.C. § 1132(a)(3) is available to remedy "violations that [§ 1132] does not elsewhere adequately remedy." *Varity Corp.*, 516 U.S. at 512; *see also id.* at 515 ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'").   The Eighth Circuit has applied this language to mean that "where a plaintiff is provided adequate relief by the right to bring a claim for benefits under . . . § 1132(a)(1)(B), the plaintiff does not have a cause of action to seek the same remedy under § 1132(a)(3)(B)." *Antolik v. Saks, Inc.*, 463 F.3d 796, 803 (8th Cir. 2006) (declining to reinstate cause of action under § 1132(a)(3) upon reversal of district court's award of benefits under § 1132(a)(1)(B)); *see also Conley v. Pitney Bowes*, 176 F.3d 1044, 1047 (8th Cir. 1999) ("[W]here a plaintiff is provided adequate relief by the right to bring a claim for benefits under § 1132(a)(1)(B), the plaintiff does not have a cause of action to seek the same remedy under § 1132(a)(3)(B)" (alterations and internal quotations omitted)).

_____

(Footnote continued.)

could be entitled to compensatory-like relief for his fiduciary duty claim on the basis of a variety of equitable theories – reformation, surcharge, or estoppel. *Id.* at 22-23.  This further supports the Court's conclusion that, were he not entitled to benefits under 29 U.S.C. § 1132, Lanpher would be entitled to the equitable relief of being treated as though he had been properly enrolled from the start.

MetLife argues that this bars the availability of a claim for fiduciary duty because Lanpher was able to bring a claim for denial of benefits under § 1132(a)(1)(B). However, the Eighth Circuit recently clarified its interpretation of *Varity Corporation* and its progeny:

> We do not read Varity and Pilger to stand for the proposition that Silva may only plead one cause of action to seek recovery of his son's supplemental life insurance benefits. Rather, we conclude those cases prohibit duplicate recoveries when a more specific section of the statute, such as § 1132(a)(1)(B), provides a remedy similar to what the plaintiff seeks under the equitable catchall provision, § 1132(a)(3).

*Silva*, slip op. at 24.   Thus, were the Court to have concluded that Lanpher was not entitled to relief under his claim for denial of benefits under 29 U.S.C. § 1132, relief for his fiduciary duty claim would still be available to him.

### B.    Fiduciary Duty Claim

A plaintiff must prove three elements to succeed on a claim for breach of fiduciary duty under ERISA: (1) the defendant is a plan fiduciary, (2) the defendant breached its fiduciary duty, and (3) that the breach resulted in harm to the plaintiff.  *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 312 F. Supp. 2d 1165, 1175 (D. Minn. 2004) (citing 29 U.S.C. § 1109); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).  MetLife does not contest that Lanpher has demonstrated the third element – that he suffered harm as a result of the circumstances surrounding his enrollment in 2001 – so the Court will address only the first two elements.

### 1.    Fiduciary Capacity

MetLife acknowledges that it is a fiduciary of the Supplemental Plan, but contends that it was not acting in a fiduciary capacity when it handled Lanpher's enrollment in the Plan as required by ERISA.  *See Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 645 (8th Cir. 2007) (ERISA "requires that an employer-fiduciary wear the fiduciary hat when" the "acts in question took place" (internal quotations omitted)).  ERISA sets out a definition of fiduciary, which states:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  The Supreme Court has observed that this "limit[s] the scope of fiduciary activity to discretionary acts of plan 'management' and 'administration.'" *Varity Corp.*, 516 U.S. at 502.

Although the parties do not dispute the facts in the record indicating what MetLife's role is with regard to the Supplemental Plan, they do dispute whether that role, particularly the role MetLife had with regard to Lanpher's application, falls within the scope of a fiduciary responsibility under ERISA.  MetLife argues that its role in communicating with Merrill Lynch is a "ministerial function," and not one that is subject to the fiduciary duties in § 1104.  It points to Department of Labor guidance which states that certain activities do not constitute fiduciary activities:

[P]ersons who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan:

. . .

(7) Orientation of new participants and advising participants of their rights and options under the plan;

(8) Collection of contributions and application of contributions as provided in the plan;

. . .

(10) Processing of claims; and

(11) Making recommendations to others for decisions with respect to plan administration[.]

29 C.F.R. § 2509.75–8.  Rather, the guidance indicates that:

Only persons who perform one or more of the functions described in [§ 1002(21)(A)] with respect to an employee benefit plan are fiduciaries. Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

*Id.*  MetLife acknowledges that it is the "claims fiduciary with respect to the adjudication of claims for benefits under the terms of the Plans," but that with regard to other responsibilities, "such as processing Plaintiff's Statement of Health," it does not act in a fiduciary capacity.  (MetLife's Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 22.)

Lanpher acknowledges that ministerial functions are not within the scope of fiduciary roles, but argues that MetLife performs a discretionary, fiduciary duty in

reviewing and deciding whether to insure potential participants based on the Statement of Health and that communicating that discretionary decision to Merrill Lynch is properly considered within the scope of MetLife's fiduciary role.

Certainly, an insurance company is not "an ERISA fiduciary merely because it handles claims under an employer's group policy." *Kerns v. Benefit Trust Life Ins. Co.*, 992 F.2d 214, 216 (8th Cir. 1993). However, insurance companies do perform certain fiduciary responsibilities, such as deciding whether to award benefits on a claim. *See id.* at 216-17 (acknowledging that insurance company would likely be fiduciary with regard to claims handling). Here, MetLife not only made claims determinations, but also made initial eligibility decisions when an employee was required to submit evidence of insurability. The Certificate of Insurance states that, for employees like Lanpher who requested the Supplemental insurance:

> More than 45 days after the date You become eligible for such Insurance, You must give evidence of Your insurability satisfactory to us . . . . If We determine that You are insurable, such insurance will take effect on the date We state in Writing . . . .

(ML 121 (emphasis omitted).) This language, particularly that it requires the evidence of insurability to be "satisfactory" to MetLife, is sufficient to indicate that MetLife exercised discretion with regard to the management of the Plan in determining whether employees applying for coverage over forty-five days after the initial eligibility period could enroll in the Plan. *See Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 803 (8th Cir. 2014) (long-term disability plan language stating, among other things, that insurance company "may request . . . proof of continuing disability, satisfactory to

Prudential," indicated discretionary decisionmaking such that abuse of discretion standard applied for review of claim decision and observing that in a prior case, "we held that a plan requiring that the employee submit 'written proof of continued total disability . . . satisfactory to [the plan administrator]' was sufficient to trigger abuse of discretion review." (quoting *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002))).

The specific act in question, though, was not merely MetLife's decision that Lanpher was eligible to participate in the Supplemental Plan based on his Statement of Health, but instead its failure to communicate that approval to Merrill Lynch. MetLife argues that this responsibility was merely processing or transmitting the application and cites several cases which it argues indicate that such activities are ministerial rather than fiduciary. *See, e.g.*, *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 633 (8th Cir. 2001) (insurance agent and company were not "ERISA fiduciaries in regard to the routine processing of Johnston's application, including participant and beneficiary notification" where they exercised no discretionary decisionmaking and were responsible only for transmitting policy applications); *Kerns*, 992 F.2d at 216-17 ("[A]n insurer that performs [the] limited function" of "normal contractual claims handling function under a group policy . . . is not a 'fiduciary with respect to a plan' under § 1002(21)(A).").

But, unlike the insurers in these cases, MetLife did not merely **process** Lanpher's Statement of Health; it had to actually **determine** whether, "satisfactory" to MetLife, the Statement of Health indicated that Lanpher was insurable. Once it made this determination, MetLife then was responsible for communicating the determination to

Merrill Lynch.  This act of communicating the approval was the action that put into effect its approval decision, and it too falls within the scope of discretionary, fiduciary responsibilities under ERISA.  As the Supreme Court recognized in *Varity Corporation*, "[t]he law of trusts also understands a trust document to implicitly confer such powers as are necessary or appropriate for the carrying out of the purposes of the trust" and that fiduciary responsibilities "also include[] the activities that are ordinary and natural means of achieving the objective of the plan."   516 U.S. at 502, 504 (internal quotations omitted).

Thus, "[f]ailing to notify [Merrill Lynch of its approval determination] falls squarely under [the] fiduciary obligations set forth in 29 U.S.C. § 1002(21)(A)." *Womack v. Orchids Paper Prods. Co. 401(K) Sav. Plan*, 769 F. Supp. 2d 1322, 1329 (N.D. Okla. 2011) (holding that employer was acting as a fiduciary when it failed to notify plan trustee of plaintiff's investment decisions, relying on *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 253 (2008) (where employee alleged that he directed his employer "to make certain changes to the investments in his individual [401(k)] account, but [the employer] never carried out the[] directions," allegations fell "squarely" within the category of fiduciary obligations under ERISA)).

## 2.      Fiduciary Breach and Lanpher's Expert

The second element of a breach of fiduciary duty claim is that the fiduciary breached that duty.  *In re Xcel Energy*, 312 F. Supp. 2d at 1175.  In its briefing, MetLife does not substantively argue that, assuming that it acted in a fiduciary capacity, it was not

a breach of fiduciary duty to fail to inform Merrill Lynch that it had approved Lanpher's Statement of Health such that Merrill Lynch should treat him as being enrolled. Instead, MetLife's only argument is that the Court should strike Lanpher's expert, Richard Fitzpatrick, who opines that MetLife breached its fiduciary duty. The Court concludes, without relying on Fitzpatrick's opinion, that the evidence indicates that MetLife breached its fiduciary duty to Lanpher by failing to properly inform Merrill Lynch of his enrollment. The Court will thus deny MetLife's motion to strike Fitzpatrick's expert opinion as moot.

"ERISA imposes upon fiduciaries twin duties of loyalty and prudence, requiring them to act 'solely in the interest of [plan] participants and beneficiaries' and to carry out their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Braden*, 588 F.3d at 595 (quoting 29 U.S.C. § 1104(a)(1)). Courts have repeatedly found failures in managing enrollment, such as the one Lanpher claims MetLife made here, to amount to breaches of the duty of prudence. *See, e.g.*, *Fink v. Dakotacare*, 324 F.3d 685, 691 (8th Cir. 2003) (failure to apply premium payment in a manner that preserved employee's continuation coverage was breach of fiduciary duty); *Atwood*, 482 F. Supp. 2d at 1315-16 (employer breached its fiduciary duty by failing to properly or timely handle an employee's confusing and incomplete enrollment form for participation in long-term disability plan).

The evidence here indicates that it was MetLife's responsibility to inform Merrill Lynch when it approved an employee for Supplemental insurance, but that MetLife failed to do so in Lanpher's case. Lanpher was listed in MetLife's internal records as having been approved, but his name was not on the list that Merrill Lynch had of the participants sent to it by MetLife. MetLife also did not carbon copy Merrill Lynch, as was apparently its practice, on its approval letter to Lanpher. Although MetLife claims that its method for notifying Merrill Lynch of individual approvals was through weekly status reports, it has failed to produce the reports because it no longer has them. Based on this evidence, the Court concludes that no reasonable jury could conclude that MetLife's conduct with regard to Lanpher was not a breach of its duty to handle his application with "care" and "diligence." 29 U.S.C. § 1104. The Court therefore concludes that, were Lanpher not entitled to relief under 29 U.S.C. § 1132, summary judgment in his favor would be appropriate on his claim against MetLife for breach of fiduciary duty.

## V.   LANPHER'S OTHER ARGUMENTS

Lanpher presents several other theories upon which he argues he is entitled to relief, including equitable estoppel, federal common law, and waiver. The Court declines to address these arguments as it concludes that Lanpher is entitled to relief under his challenge to MetLife's denial of benefits under 29 U.S.C. § 1132 or, in the alternative, his claim for breach of fiduciary duty against MetLife under 29 U.S.C. § 1104.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Merrill Lynch/Bank of America's Motion for Summary Judgment [Docket No. 36] is **GRANTED**.

2.      Defendant MetLife's Motion for Summary Judgment [Docket No. 44] is **DENIED**.

3.      Plaintiff's Motion for Partial Summary Against MetLife [Docket No. 48] is **GRANTED**.

**IT IS FURTHER HEREBY ORDERED** that:

4.      Within twenty-one (21) days of the entry of this Order, Plaintiff shall meet and confer with Defendant MetLife to ascertain whether any disputes exist regarding damages.

a.      If the parties agree on the amount of damages owed to Plaintiff, the parties shall submit a stipulation to the Court regarding such damages.

b.      If the parties are unable to agree on the amount of damages, within twenty-eight (28) days of the entry of this Order, Plaintiff shall submit to the Court, and serve upon Defendant MetLife: (a) a letter brief not to exceed 3,000 words regarding its damages calculation; and (b) documentation supporting its damages request.

c.      Within seven (7) days after service of Plaintiff's letter brief, Defendant MetLife may submit to the Court, and serve upon Plaintiff: (a) a letter

brief not to exceed 3,000 words raising any objections it may have to Plaintiff's damages calculation; (b) a request for a hearing, status conference, or trial regarding the issue of damages, if necessary; and (c) documentation supporting its objections and request.

DATED:   September 29, 2014
at Minneapolis, Minnesota.

s/ John R. Tunheim

JOHN R. TUNHEIM
United States District Judge